### McWHORTER v. UNITED STATES,
### and three other cases.

(Circuit Court of Appeals, Eighth Circuit. February 25, 1924.)

Nos. 6247-6250.

1. **Criminal law ⟨key⟩1129(2)—Practice of filing unnecessary number of assignments of error condemned.**

The needless multiplication of assignments of error is improper practice, and to be condemned.

2. **Criminal law ⟨key⟩1134(4)—Overruling of motion for new trial reviewable, where based on juror's disqualification.**

Ordinarily the overruling of a motion for new trial is not reviewable in the federal courts, but where the motion was based on the alleged illegality of the verdict because of the disqualification of one of the jurors, which, if true, deprived defendant of his right to a fair trial, an assignment of error based on the denial of a new trial may be considered.

3. **Criminal law ⟨key⟩829(1)—Refusal of requested instructions not error, where covered by the charge given.**

Refusal of requested instructions is not error, where they are fully covered by the charge given, though in different language.

---

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Conspiracy ⬪⟹48—Evidence held to require submission of case to jury.**

Evidence in support of an indictment for conspiracy to devise a scheme to defraud, and to carry it into effect by use of the mails, *held* sufficient to require submission of the case to the jury.

In Error to the District Court of the United States for the District of Nebraska; Thomas C. Munger, Judge.

Criminal prosecutions by the United States against William A. Mc-Whorter, against Charles S. Wohlberg, against Jacob Masse, and against William G. Chipley. Judgment of conviction, and defendants separately bring error. Affirmed.

Hal. S. Corbett, of New York City, for plaintiff in error Chipley.

T. S. Allen, of Lincoln, Neb. (A. L. Sutton, of Omaha, Neb., on the brief), for other plaintiffs in error.

James C. Kinsler, U. S. Atty., of Omaha, Neb. (George A. Keyser, Asst. U. S. Atty., of Omaha, Neb., on the brief), for the United States.

Before SANBORN and KENYON, Circuit Judges, and TRIEBER, District Judge.

TRIEBER, District Judge. The plaintiffs in error, hereinafter referred to as the defendants, were jointly indicted, charged with a violation of section 37 of Penal Code (Comp. St. § 10201), as having conspired to devise a scheme to defraud, and to carry it into effect having used the mails of the United States, in violation of section 215 of the Penal Code (Comp. St. § 10385). Upon a trial to a jury they were found guilty, and after sentence on the verdict of the jury prosecuted this writ of error.

There are 33 assignments of error, but in their briefs counsel for defendants only set out 6 assignments, and in their oral argument only insisted on 3 of the assignments of error. The assignments of error relied on in the argument are:

(1) That one of the jurors who tried the cause was prejudiced against the defendants, and had knowledge of the facts upon which the government relied, which fact was not and could not by the utmost diligence have been discovered until after the trial and verdict, when a motion for new trial was filed on that ground, and by the court erroneously overruled.

(2) That the court erred in refusing to give an instruction, asked by the defendants, in which the jury was to be told that the true test is the intent of the parties, and that before there could be a verdict of guilty they must find beyond a reasonable doubt, from the evidence introduced, that the defendants did not honestly believe that from the money received by them from the disposition of the stock of the William Berg Company, and placed in the treasury of said company to be used for the purpose it was intended, the stock would not become of the value at which same was to be disposed of by defendants.

(3) That the court erred in refusing defendants' request for a directed verdict of not guilty.

The case was submitted to the jury upon the evidence introduced by the government; the defendants introducing no evidence.

[1] Multiplying assignments of error has been so frequently condemned by all appellate courts of the United States, including the Supreme Court of the United States, that there is no reason for learned counsel to continue this practice at this time. We refer to what was said on that subject in Phillips & Colby Construction Co. v. Seymour, 91 U. S. 646, 648, 23 L. Ed. 341; Grayson v. Lynch, 163 U. S. 468, 16 Sup. Ct. 1064, 41 L. Ed. 230; Central Vermont Ry. Co. v. White, 238 U. S. 507, 35 Sup. Ct. 865, 59 L. Ed. 1433, Ann. Cas. 1916B, 252; Chesapeake & Delaware Canal Co. v. United States, 250 U. S. 123, 39 Sup. Ct. 407, 63 L. Ed. 889; Pulver v. Union Investment Co., 279 Fed. 699, decided by this court; Chicago Great Western Ry. Co. v. McDonough, 161 Fed. 659, 88 C. C. A. 517.

The indictment is very lengthy, covering nearly 29 printed pages of the record. As some of the charges contained in the indictment were not submitted to the jury, as the learned trial judge stated in his charge that some of them were not established by sufficient evidence, and others, if established, would not amount to a scheme to defraud, we will only set out such parts of the indictment as were submitted to the jury and resulted in the verdict of guilty. It charged the four defendants with having conspired with themselves and one Charles L. Dundey, who died before the return of the indictment, to violate section 215 of the Penal Code. The gravamen of the charge is that they had secured for a nominal consideration possession and control of a certain corporation called the William Berg Company, which had theretofore been organized in the state of Nebraska, with an authorized capital of $10,000, for the ostensible purpose of carrying on a blacksmithing business and dealing in blacksmithing supplies, etc., but which corporation had long before then ceased to operate; that they had then elected themselves officers of said corporation and increased its capital stock to $1,000,000, divided into 10,000 shares, of the par value of $100 each; that they would then issue and enter or cause to be entered upon the books of said corporation several thousand shares of stock to themselves, without any consideration, or without yielding or paying to the corporation anything of value therefor, and caused the stock to be sold to the public generally at fictitious prices, and prices greatly in excess of the value of the same, with the intent to convert the proceeds of said sales, or a large part of them, to their own use and benefit; that they had falsely and fraudulently represented and claimed, by means of advertisements, letters, circulars, pamphlets, and writings which they had placed in the United States post office at Omaha, Neb., and other post offices of the United States, addressed to persons intended to be defrauded, to be sent and delivered by the post office establishment, stating therein that the William Berg Company was a financially strong company, engaged legitimately and in good faith in the manufacture of potash, that all its stock, amounting to $1,000,000 had been sold, and that there was a great demand for additional stock, and that large premiums were being offered for such stock, and that no stockholder could be found willing to part with the stock at $150 a

share; that large dividends would be paid to all stockholders; that its plant would be completed and ready for operation on or about March 10, 1918, and that no stock had been issued or would be issued, except for value, and, when issued, would be fully paid up—all of which statements, it is charged, were false and fraudulent, and so known to the conspirators; that as a further part of said scheme and artifice to defraud, so to be devised and which was in fact thereafter devised by said defendants, they had organized a corporation to be known as the Neb-Ota Company, and also a partnership to be known as W. A. McWhorter Company, both of them to be owned by the defendants, and that they had then converted large sums of money, which should come into the possession and ownership of the William Berg Company by means of fraudulent sales of its stock, to the Neb-Ota Company and W. A. McWhorter & Co. without any consideration therefor moving to the William Berg Company; that it would be done by pretended payment of commissions and royalties on the sale of stock, and the pretended payment of large sums for potash leases much in excess of the sums actually to be paid, thereby rendering the stock of the William Berg Company of no value whatever; that the representations and statements made in the circulars were intended and known to them to be false and fraudulent, and in furtherance of the scheme and artifice to defraud the parties to whom such stock should be sold, and convert the money received therefor to their own use and benefit. It then sets out as overt acts the mailing of the letters, circulars, and newspaper articles through the mails of the United States to the parties named in the indictment. There were 17 of such letters and newspaper articles sent through the mails, all set out in one count.

## I.

[2] Did the court err in denying the motion for a new trial upon the ground that one of the jurors, who was accepted at the trial, Mr. J. H. Stafford, was familiar with the facts charged in the indictment and on his examination had denied it, which fact was only discovered by the defendants after the trial and rendition of the verdict, and could not have been discovered by the exercise of reasonable diligence?

Ordinarily a motion for new trial is not subject to review by the appellate courts of the United States. In Union Central Life Ins. Co. v. Skipper, 115 Fed. 69, 76, 52 C. C. A. 663, the motion was based on a newspaper article published while the trial was in progress in the Circuit Court. The article commented on alleged facts involved in the case, and was highly prejudicial to the plaintiff in error. The court in that case, after hearing evidence, denied the motion, and it was assigned as error in the assignment of errors. Judge Thayer, speaking for this court, said:

"The action of the lower court in overruling the motion for a new trial is not subject to review by this court. * * * We may remark, however, that the trial judge should have set the verdict aside if he had any reasonable ground to believe that the verdict had been influenced by the publication."

As in the instant case the liberty of these defendants is involved, we have carefully examined the record to ascertain whether the evidence

submitted at the hearing on the motion justified the finding of the trial judge that the allegations in the motion were not sustained. We agree with the trial judge that there was a total failure to sustain the charges contained in the motion. The memorandum opinion of the learned trial judge evidences the great care exercised by him in the determination of the motion.

## II.

[3] Did the court err in failing to give the instruction requested on behalf of the defendants, hereinbefore referred to?

From a careful reading of the charge of the court we find that this request was fully covered in the charge, although not in the language of the requested instruction. The court charged:

"If the promoters, the directors, the holders, or owners of controlling shares that have been issued by a corporation, such as I have mentioned, had planned to issue capital stock to themselves for some consideration that they honestly believed is to be and will be reasonable and adequate to be given in payment for it, and if they honestly believed at the time that they have a legal right to issue such shares to themselves, then they could not be said to be guilty of a scheme to defraud within the meaning of the statute."

All through the charge the learned trial judge impressed on the jury that the intent to defraud is one of the most important allegations in the indictment and must be proved beyond a reasonable doubt. Therefore no error was committed in refusing to charge in the language requested, as the request was fully covered by the court in its charge.

## III.

[4] Was there substantial evidence to warrant the court to submit the case to the jury?

As hereinbefore stated, the persons charged to have participated in the conspiracy were the defendants and one Charles L. Dundey, who died before the return of the indictment. There was substantial evidence of the following facts:

That F. V. H. Collins, president of the Wyo-Mont Company, owned some leases for potash lands, an interest in which he conveyed to O. L. Kreiss and others. These leases were held for the purpose of exploiting and selling them. The defendant McWhorter called on Mr. Kreiss for the purpose of purchasing these leases, and offered to pay for them $20,000 in cash, and $100,000 in paid-up stock in a corporation which he and his associates would form with a capital stock of $1,000,000. The next day Mr. Kreiss and Mr. La Fleiche, another of the owners of these leases, met defendants McWhorter and Wohlberg. Mr. La Fleiche was a little skeptical about dealing with a promotion proposition, and having the name of his corporation brought into it, especially as it would take some time to get into action, whereupon Wohlberg said:

"We will not have to lose any time, as we have arranged for an old charter, and won't have to go before the Blue Sky Commission."

They then asked them to meet their lawyer, Mr. Dundey. After Mr. Dundey had seen Mr. La Fleiche he thought that they would do

business with the defendants. Mr. La Fleiche then stated that he would have to leave for Chicago. The defendants McWhorter and Wohlberg then proposed to Mr. Kreiss that they would give him $10,000 of the paid-up stock if he could induce Mr. La Fleiche to close before he would leave, and thereupon it was decided to accept the proposition On a later day they met at Mr. Dundey's office, when they were informed that the defendants had completed the arrangements for the charter of their company and were ready to enter into a contract to purchase the leases. The consideration was to be $25,000 in cash, and $100,000 in stock. McWhorter wanted $500,000 of the stock of their proposed corporation for promoting the company. This was objected to by Mr. La Fleiche, stating that he would not be willing to sell the leases and take his interest in the company, if $500,000 was going to be issued for the promotion. Thereupon the defendant McWhorter agreed that he would take $200,000 of the stock, which was agreed to. Three hundred thousand dollars stock was to be issued as for the purchase money, and $200,000 of it to be returned to McWhorter and the other defendants, less the $10,000 which had been agreed to be paid to Mr. Kreiss. This last agreement, as well as the contract for the sale of the leases, was reduced to writing, and placed in escrow with the leases.

When it came to paying the $25,000, McWhorter said that they did not have the money, but they could get the defendant Masse to help make a payment of $5,000, $10,000 to be paid at a later day, and the last $10,000 to be paid prior to starting the plant. The leases and the agreement for the return of the $200,000 stock to be returned to the defendants were placed in escrow until the conditions for the payment of the $25,000 had been complied with.

The records of the William Berg Company, the charter of the company, with the few shares of stock held by the widow of Berg, who was the sole owner of that company, and which were purchased by the defendants for the sum of $100, showed that the first meeting of the Berg Company was attended by Wohlberg and Dundey, Dundey being the owner of 2 shares and Wohlberg of 50 shares, which the record shows was the entire issue of the capital stock of the William Berg Company, purchased from Mrs. Berg, her husband having died in 1915, and they, being the sole owners of the stock of the company, elected themselves directors, the third director to be elected later, when stock had been issued. A resolution was also adopted at that meeting, increasing the capital stock of the Berg Company to $1,000,000, divided in shares of $100 each. At a later meeting a resolution was passed authorizing the sale of 200 shares of stock of the company at 50 cents on the dollar, and another resolution to purchase the potash leases for the sum of $300,000 of the capital stock of the company. The evidence also shows that there was considerable stock of the William Berg Company sold, some at par, and some at $150 a share.

After the stock of the William Berg Company had been increased to $1,000,000 there was issued to Mr. Collins, the original owner of the leases, $100,000 in stock as part of the purchase money of the leases, $10,000 in stock to Mr. Kreiss for having induced Mr. La Fleiche to

make the contract at once, and the other $190,000 was issued to the defendants, for the alleged promotion of it, as follows: To Charles I. Dundey, charged as one of the members of the conspiracy, $15,000; to the defendant McWhorter, $58,300; to the defendant Masse, $38,900; to the defendant Chipley, $38,900; to the defendant Wohlberg, $38,900—which with the $10,000 issued to Kreiss, made a total of $200,000. It was also in evidence that the company paid McWhorter & Company the sum of $60,000 in money and a further allowance of $132,000 of which $120,000 was paid, and $12,000 is still unpaid. This was paid with money realized from sales of stock, for alleged commissions for the sales of treasury stock, although the evidence showed that the stocks sold belonged to the defendants, who claimed to have paid for them to the company, all the stock having been sold by the company. The $25,000 in cash was also paid with money received from the sale of stocks. A small plant was erected, with a capacity of 50 tons, if operated 24 hours a day, although the original plant to be erected was represented to cost $550,000. Mr. Kreiss superintended the erection of the plant. There was trouble in paying for the material to erect the plant, and considerable of it is still unpaid. For 15 days the men who operated the plant received no pay, as there was no money in the treasury to pay with.

Articles were published in all of the newspapers, set out in the indictment, which were sent through the mails. In these articles the claims which are set out in the indictment, and which are charged to have been false and fraudulent, were published. In these articles it was said:

"No stock has been issued, and no stock may be issued, except for value, and all stock, when issued, is paid up and unassessable."

The letters, which are set out in the indictment as the overt acts, were introduced in evidence, and a number of others, in which it was claimed that the potash manufactured by the Berg Company could be sold for much less than the German potash. In a letter replying to one from Mr. C. C. Carek, sent by the mail, who desired to return some of the stock, for which he had given a note, the defendant McWhorter wrote that the company cannot buy its own stock, but that the selling price of the stock has been increased from $100 to $200 per share, and therefore it would be foolish for him to sell it for what he paid for it. Similar statements were made to purchasers and intended purchasers in letters sent through the mails. In one of the letters it was stated that all the machinery for the plant had been paid for and placed.

Mrs. Fuller testified that, on the representations of the defendant Masse that the profits would be large, as the potash could be sold for $110 to $120 a ton, and its production would cost only $20 a ton; that Judge Riddick, of Omaha, had bought $5,000 of stock in another potash plant in Nebraska, and was receiving $5,000 monthly in dividends on this stock; that, relying on these statements, she bought 70 shares and paid $7,000 for it. Similar statements were made to others, and that stock in other potash companies was selling at from two to five times its face value. It is useless to set out all of the voluminous testimony introduced by the government. We agree with the learned

trial judge that it was of such a nature that to have directed a verdict of not guilty would have caused a miscarriage of justice. The jury under proper instructions found the defendants guilty.

We fail to find any prejudicial error in the record, and therefore the judgment must be and is affirmed.